## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLAIR DOUGLASS,<br><br>     Plaintiff,<br><br>  v.<br><br>PACIFIC MARKET INTERNATIONAL, LLC,<br><br><br>     Defendant. | Civil Action No. 23-1477<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Blair Douglass ("Douglass" or "Plaintiff") brings this action against Defendant Pacific Market International, LLC ("Stanley" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

## NATURE AND SUMMARY OF THE ACTION

1. Douglass is legally blind and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

2. As a result of his blindness, Douglass relies on screen access software to access digital content, like a text message, an email, or a website.

3. Defendant is a retailer that sells drinkware and more to consumers. In order to access, research, or purchase Defendant's goods and services, consumers may visit Defendant's online store, located at https://www.stanley1913.com/ (the "Online Store").

1

4.      This action arises from Defendant's failure to make its Online Store compatible with screen access software, thereby denying blind individuals,[1] including Douglass, a full and equal opportunity of "perusing the store's existing selection or purchasing whatever" goods and services that Defendant sells. *McGann v. Cinemark USA, Inc*., 873 F.3d 218, 228 (3d Cir. 2017).

5.      The fact that Defendant's Online Store is inaccessible to blind shoppers is unsurprising. In a 2011 study entitled, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, researchers explained, "[w]ith a minority of exceptions, providing accessibility is ignored in favor of faster market entrance for a product or simply because of long-standing [but false] assumptions regarding the need for accessibility and the cost of creating accessible products."[2]

6.      This exclusionary approach persists among creators notwithstanding the fact that:

> Nothing about technology makes it inherently accessible or inaccessible. Most of today's technologies are digital, meaning that they are made up of zeros and ones, and there is nothing inherently visual or auditory about zeros and ones. Digital information is not inherently accessible or inaccessible, but the choices made by those developing and implementing technology determine whether a technology will ultimately be accessible or inaccessible. This is particularly true online, given the rapid pace of technological change and introduction of new web-enabled technologies, since online technologies are often obsolete before they are made accessible.[3]

7.      Douglass files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally accessing, perusing, and purchasing

---

[1] Douglass uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision or who have low vision. *See* James H. Omvig, *Why Use the Word "Blind"?*, Braille Monitor (Jan. 2009), https://nfb.org/sites/default/files/images/nfb/publications/bm/bm09/bm0901/bm090107.htm.

[2] Brian Wentz, Paul T. Jaeger, and Jonathan Lazar, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday, Vol. 16, No. 11 (Nov. 7, 2011), https://firstmonday.org/ojs/index.php/fm/article/download/3666/3077.

[3] *Id.*

Defendant's goods and services, and because "[i]f people with disabilities are to move from being the most disadvantaged population online to equal residents of cyberspace,"[4] we must reject the mentality of retrofitting in favor of a philosophy that emphasizes the design and development of technology that is inclusive of people with disabilities from launch.

8.      Accordingly, Douglass seeks an order requiring that Defendant make its Online Store accessible and adopt sufficient policies and practices to ensure the Online Store does not become inaccessible again in the future.

## JURISDICTION AND VENUE

9.      The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

10.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing goods and services over the internet to Pennsylvania residents, including Douglass. Unlike, for example, a winery that may not be allowed to sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents.[5]

---

[4] *Id.*

[5] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

11.     These online interactions between Defendant and Pennsylvania residents involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the internet in Pennsylvania.

12.     Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located in Pennsylvania every time a Pennsylvania resident visits the Online Store.[6]

13.     Douglass was injured when he attempted to access the Online Store from Pittsburgh, Pennsylvania, but encountered communication barriers that denied him a full and equal opportunity to access, peruse, and potentially purchase the goods and services that Defendant sells.

14.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Douglass's claims occurred.

## PARTIES

15.     Douglass is a natural person over the age of 18. He resides in and is a citizen of Pittsburgh, Pennsylvania, located in Allegheny County.

16.     He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program, among other things. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh

---

[6] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 95 n.156 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf (citations omitted) ("A cookie is a message given by a Web server to a computer's Web browser. The primary purpose is to identify users and prepare customized Web pages for them. A persistent cookie is 'a cookie that is stored on a user's hard drive until it expires . . . or until the user deletes the cookie. Persistent cookies are used to collect identifying information about the user, such as Web surfing behavior or user preferences for a specific Web site.'").

School of Law. During his enrollment at Pitt Law, Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania.

17.     Douglass has advocated for blind individuals his entire life and long before filing a lawsuit.[7]

18.     The United States District Court for the Western District of Pennsylvania has often appointed Douglass to represent class members in class actions whose claims were substantially similar to the claims asserted in this individual action. *See Douglass v. P.C. Richard & Son, LLC*, No. 2:22-cv-00399, Doc. 55 (W.D. Pa. June 27, 2023) (Kelly, J.); *Douglass v. Mondelez Global, LLC*, No. 2:22-cv-00875, Doc. 16 (W.D. Pa. Apr. 13, 2023) (Hardy, J.); *Douglass v. Optavia, Inc.*, No. 2:22-cv-00594, Doc. 38 (W.D. Pa. Jan. 23, 2023) (Wiegand, J.); *Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, Doc. 47 (W.D. Pa. Feb. 16, 2022) (Baxter, J.).

19.     Defendant is a Washington limited liability company with a principal place of business in Washington.

20.     Defendant owns, operates, and/or controls the Online Store and is responsible for the policies, practices, and procedures concerning its development and maintenance.

## STANDING UP FOR TITLE III OF THE ADA

21.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

---

[7] Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette (July 23, 2009), https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[8]

22.     Decades "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[9] and private individuals[10] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[11]

23.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[12] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[13]

24.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[14]

25.     So does the Supreme Court, which "has long recognized that 'private litigation' is essential to effective enforcement of the Nation's antidiscrimination laws. Because federal

---

[8] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Case W. Rsrv. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[9] 42 U.S.C. § 12188(b).

[10] 42 U.S.C. § 12188(a).

[11] Johnson, *supra* note 8.

[12] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[13] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[14] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010).

agencies have limited enforcement resources, it would be impossible to 'secur[e] broad compliance' with those laws absent suits by individuals who experience discrimination."[15]

## SUBSTANTIVE ALLEGATIONS

### Defendant's Accessibility Policies and Inaccessible Online Store

26.     Two of the most commonly used screen reader auxiliary aids are JAWS from Freedom Scientific (available on Windows computers) and VoiceOver (available on macOS and iOS devices).[16]

27.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[17]

---

[15] Brief of the United States as Amicus Curiae Supporting Neither Party*, Acheson Hotels, LLC v. Laufer*, No. 22-429, at p. 16 (June 12, 2023) (quoting *Newman* v. *Piggie Park Enters., Inc.*, 390 U.S. 400, 401 (1968) (per curiam); *see also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement[.]").
[16] *See Screen Reader User Survey #9 Results,* WebAIM, webaim.org, https://webaim.org/projects/screenreadersurvey9/ (last accessed Aug. 15, 2023).
[17] *JAWS*®, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Aug. 15, 2023).

28.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. VoiceOver can now describe people, objects, text, and graphs in greater detail than ever. Auditory descriptions of elements help you easily navigate your screen through a Bluetooth keyboard or simple gestures on a touchscreen or trackpad. And with unique rotor gestures that function like a dial on touchscreens and trackpads, you can make content such as websites a breeze to browse."[18]



29.    Here is an example of another online store's use of audio descriptions to communicate its products to screen reader users.[19] The image on the left illustrates what shoppers perceive visually when browsing the online store with an iPhone. To the right is an image



from the online store with the audio description highlighted for that image in green. Although invisible to the eye, screen access software reads this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. In this example, when shoppers tab to the image file with a screen reader, the online store announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require audio descriptions,

---

[18] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Aug. 15, 2023).
[19] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

frequently called "alternative text," like this to be able to access, peruse, and potentially purchase goods and services sold online.

30.     Unfortunately, because of Defendant's failure to build the Online Store in a manner that is compatible with screen access software, Douglass is unable to fully and equally access, peruse, and potentially purchase Defendant's goods and services.

31.     For example, as a result of visiting the Online Store in May 2023, and from investigations performed on his behalf, Douglass found that he could not fully and equally access and peruse the goods and services available in the Online Store in at least the following ways, thereby deterring him from completing a purchase, if not altogether denying him that opportunity.

(a)     Defendant prevents screen reader users from accessing some primary content. For example, when consumers visit the Online Store from a new IP address, Defendant displays a pop-up window inviting them to "UNLOCK 10% OFF YOUR ORDER." Consumers who perceive content visually can click the button labeled "TAP TO REDEEM" to claim the promotion. Unfortunately, Defendant does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the Online Store's underlying page, making the pop-up invisible to screen reader users. As a result, it is impossible for Plaintiff to perceive this promotion independently, the effect of which would require him to pay more on his order than consumers who do not use screen reader technology to shop online. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/GrUSLn1SZBY?feature=share.

(b)     Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud

using synthesized speech. For example, the Online Store provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/AcDT8fYEIO4?feature=share.

(c)      Defendant uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed visually through an audio means is necessary to ensure that consumers who cannot see can still perceive this information. For example, Defendant places a slash atop the colors in which a particular product is unavailable. Consumers who perceive content visually will see this visual cue and infer that the product they're researching is unavailable in the corresponding color. Unfortunately, Defendant fails to include sufficiently descriptive alternative text to also identify which colors are unavailable, making it impossible for Plaintiff to discover which colors are out-of-stock. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/9QQGY7mO360?feature=share.

(d)      Defendant prevents screen reader users from accessing order summaries and entering gift card and discount codes. Consumers will notice a "Show order summary" button during Defendant's online checkout process. When consumers click this button, Defendant displays important order details, including a list of the products to be purchased, the quantity, color, size, and price of such products, and the subtotal amount to be paid on the order. Defendant

also supplies a text field into which consumers can type gift card or discount codes. Unfortunately, consumers who use screen readers to shop online can access neither this order information nor this opportunity to use gift cards and discount codes. Instead, Defendant maintains the Online Store in such a way that screen readers skip over this information and text field. As a result, Defendant deprives Plaintiff and other screen reader users of the ability to review a summary of their order and to benefit from discounts before completing a purchase. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/cOUKA4Q8ud4?feature=share.

32.     Consistent with public policy encouraging the resolution of "dispute[s] informally by means of a letter[,]" *see Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006), which "prelitigation solutions [are] clearly, the most expedient and cost-effective means of resolving" digital accessibility claims, *see Sipe v. Am. Casino & Ent. Properties*, LLC, 2016 WL 1580349, at *2-3 (W.D. Pa. Apr. 20, 2016), Douglass contacted Defendant about its inaccessible Online Store and attempted to resolve his discrimination claims before commencing litigation. That attempt was unsuccessful.

33.     As a result, Douglass and his counsel completed another review of Defendant's Online Store in July 2023. This subsequent investigation confirms that notwithstanding Douglass's good faith, pre-litigation attempts to resolve his concerns, Defendant's Online Store remains inaccessible and Defendant's accessibility policies and practices remain insufficient.

(a)     Defendant prevents screen reader users from accessing some primary content. For example, when consumers visit the Online Store from a new IP address, Defendant displays a pop-up window inviting them to "UNLOCK 10% OFF YOUR ORDER." Consumers who perceive content visually can click "TAP TO REDEEM" to claim the promotion.

Unfortunately, Defendant does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the Online Store's underlying page, making the pop-up invisible to screen reader users. As a result, it is impossible for Plaintiff to perceive this promotion independently, the effect of which would require him to pay more on his order than consumers who do not use screen reader technology to shop online. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/eyLhyMOuGTQ?feature=share.

(b)     Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Online Store provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies fail to provide sufficiently descriptive alternative text for this important rating information. To this end, screen readers announce "a black star against a white background," "a black star in front of a white background," and "a black arrow on a white background," when they hover over the stars on the Online Store. As a result, Plaintiff must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/2fB-usowncI?feature=share.

(c)     Defendant uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing

information conveyed visually through an audio means is necessary to ensure that consumers who cannot see can still perceive this information. For example, Defendant places a white "/" atop the colors in which a particular product is unavailable. Consumers who perceive content visually will see this visual cue and infer that the product they're researching is unavailable in the corresponding color. Unfortunately, Defendant fails to include sufficiently descriptive alternative text to also identify which colors are unavailable, making it impossible for Plaintiff to discover which colors are out-of-stock. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/2OZl-MpD3aY?feature=share.

(d)     Defendant prevents screen reader users from accessing order summaries and entering gift card and discount codes. Consumers will notice a "Show order summary" button during Defendant's online checkout process. When consumers click this button, Defendant displays important order details, including a list of the products to be purchased, the quantity, color, size, and price of such products, and the subtotal amount to be paid on the order. Defendant also supplies a text field into which consumers can type gift card or discount codes. Unfortunately, consumers who use screen readers to shop online can access neither this order information nor this opportunity to use gift cards and discount codes. Instead, Defendant maintains the Online Store in such a way that screen readers skip over this information and text field. As a result, Defendant deprives Plaintiff and other screen reader users of the ability to review a summary of their order and to benefit from discounts before completing a purchase. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/mognrLVfMpw?feature=share.

(e)     A CAPTCHA (Completely Automated Public Turing Tests to Tell Computers and Humans Apart) is a feature/tool to ensure that user input has not been generated

by a computer. The problem with CAPTCHAs is that they are not accessible to all types of users, which means that some users will not be able to complete the form on the website. Defendant requires that consumers answer a reCAPTCHA security question in order to complete an online form on the Online Store. Unfortunately, the question's audio alternative is difficult to understand, making it difficult (or impossible) for some screen reader users, including Plaintiff, to complete successfully. As a result, Plaintiff is less likely to contact Defendant using the online form. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/cEXzcyJN6-o?feature=share.

## Plaintiff's Injury

34.     The access barriers described above, and others, deny Douglass a full and equal opportunity to access, peruse, and potentially purchase the goods and services available in Defendant's Online Store today.

35.     Not only do these barriers limit the universe of retailers in which Douglass may obtain goods and services, they also humiliate and deter Douglass from returning to the Online Store, where he cannot help but feel second-class each time he is unable to perceive, understand, or activate a particular piece of content.

36.     Still, Douglass intends to attempt to access the Online Store within the next six months to determine if it is accessible and, if so, to peruse and potentially complete a purchase at that time.

## Defendant Received Fair Notice of its ADA Obligations

37.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or

accommodations" to people with disabilities,[20] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[21]

38.    DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[22]

39.    In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[23]

40.    In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[24]

---

[20] 42 U.S.C. § 12182(a).

[21] 42 U.S.C. § 12182(b)(2)(A)(iii).

[22] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), https://www.justice.gov/crt/foia/file/666366/download (last accessed Aug. 15, 2023).

[23] Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Aug. 15, 2023) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[24] Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last accessed Aug. 15, 2023).

41.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website was inaccessible to some individuals with disabilities.[25]

42.     In a 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed: "[t]he Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities."[26]

43.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that Title III covers websites and mobile applications.[27]

44.     In 2022, DOJ published "Guidance on Web Accessibility and the ADA," reiterating that DOJ "has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."[28]

45.     In 2023, DOJ submitted an amicus brief to the Supreme Court, confirming that "while the physical accessibility of a public accommodation's 'facilities' is an important aspect of

---

[25] *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://www.justice.gov/file/163956/download (last accessed Aug. 15, 2023).
[26] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Aug. 15, 2023).
[27] *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), *cert. denied* 140 S. Ct. 122 (2019) (No. 18-1539).
[28] Civil Rights Division, Department of Justice, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://beta.ada.gov/resources/web-guidance/ (last accessed Aug. 15, 2023).

ADA compliance, Title III also applies to 'services,' 42 U.S.C. 12182(a), including 'those offered on the web,' Civil Rights Div., DOJ, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022) (emphasis omitted), https://perma.cc/CLG6-EK9A."[29] DOJ further confirmed a plaintiff suffers a particularized injury for standing purposes when she "suffers a violation of a statutory right to be free from discrimination, even if she experiences that violation over the Internet."[30]

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

46.     The assertions contained in the previous paragraphs are incorporated by reference.

47.     Douglass is an individual with a "disability." With respect to an individual, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). The ADA defines "major life activities" to include, in relevant part, "seeing[.]" 42 U.S.C. § 12102(2)(A). Because Douglass is blind, he meets Title III's definition of an individual with a disability.

48.     Defendant operates a place of public accommodation under Title III. Title III defines a "public accommodation" as including a "sales or rental establishment" and/or "other service establishment[.]" 42 U.S.C. § 12181(7)(E), (F). Because Defendant provides goods and services to the general public, it meets Title III's definition of a place of public accommodation.

49.     Title III begins with a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

---

[29] Brief of the United States, *Acheson Hotels, LLC*, No. 22-429, at p. 23.
[30] *Id.* at 24.

50.     The statute contains several general prohibitions, including a prohibition against "denying an individual on the basis of a disability 'the opportunity . . . to participate in or benefit from the goods [or] services' of a public accommodation." 42 U.S.C. § 12182(b)(1)(A)(i).

51.     These general prohibitions are supplemented by several specific prohibitions, including an auxiliary aids and services requirement, which requires public accommodations to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

52.     The United States Department of Justice ("DOJ") has issued regulations implementing the ADA, including the auxiliary aid and service requirement.

53.     These regulations define "screen reader software," like what Douglass used to attempt to access the Online Store, as being a covered "auxiliary aid and service." 28 C.F.R. § 36.303(b)(2).

54.     The regulations also include an effective communication requirement, which requires public accommodations to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

55.     DOJ has issued regulatory guidance noting that the duty to provide effective communication with customers is implicit in the duty of a public accommodation to provide auxiliary aids and services. Appx. A to Part 36 - Guidance on Revisions to ADA Regulation on

Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.[31]

56.     DOJ also has issued a Technical Assistance Publication, which provides guidance on communicating effectively with individuals who have vision, hearing, or speech disabilities. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014).[32] This publication requires the provision of "information technology that is accessible (either independently or through assistive technology such as screen readers)." *Id.*

57.     Against this backdrop, the Third Circuit explained in another Title III case concerning the effective communication requirement and auxiliary aids:

> A bookstore offers customers the ability to select and purchase books from the store's shelves and inventory. Our case law and 28 C.F.R. § 36.307(a) instruct that a bookstore may not need to offer Brailled versions of books, if doing so would require altering the mix of goods provided. But we would have little trouble concluding that a bookstore had denied service to a customer if that customer was forbidden from perusing the store's existing selection or purchasing whatever book he or she chose. So, as the District Court's opinion implied and Cinemark does not dispute, the bookstore may need to provide an auxiliary aid or service to assist a customer who is blind with selecting and purchasing a book, so that he or she is not excluded from or denied the goods already offered by the bookstore, in violation of Title III.[33]

58.     Like the bookstore in *McGann*, Defendant has violated Title III's general anti-discrimination mandate and effective communication requirement by denying Douglass a full and equal opportunity to access, peruse, and potentially purchase the goods and services available in the Online Store.

---

[31] This guidance is available at https://www.ecfr.gov/current/title-28/chapter-I/part-36/appendix-Appendix%20A%20to%20Part%2036 (last accessed Aug. 15, 2023).
[32] This guidance is available at http://www.ada.gov/effective-comm.htm (last accessed Aug. 15, 2023).
[33] *McGann*, 873 F.3d at 228.

59.     This unequal treatment also humiliates and deters Douglass from attempting to access the Online Store, thereby forcing him to wait until Defendant elects to retrofit the Online Store before he can access, peruse, and complete a purchase with the same ease as consumers who are not blind.

## PRAYER FOR RELIEF

WHEREFORE, Douglass requests judgment as follows:

(A)     A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure Douglass could fully, equally, and independently access Defendant's online community, products, and services;

(B)     A permanent injunction, pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a), which directs Defendant to take all steps necessary to ensure its goods and services are fully, equally, and independently accessible to Douglass, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law— the specific injunctive relief requested by Plaintiff is described more fully below;

(1)     Within 90 days of the Court's order, Defendant shall complete an accessibility audit of its Online Store that will examine the accessibility and usability of the Online Store by consumers who are blind.

(2)     Within 180 days of the Court's order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)     Within 210 days of the Court's order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Online Store.

(4)     Within 90 days of the Court's order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted in the header of each homepage on the Online Store within 120 days of the Court's order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Online Store within 180 days of the Court's order.

(5)     Within 240 days of the Court's order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Online Store. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)     Within 12 months of the Court's order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12 months of the Court's order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12 months of the Court's order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Online Store to

provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.1 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)      Within 18 months, all pages hosted on the Online Store that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)     Defendant shall not release for public viewing or use a substantial addition, update, or change to the Online Store until it has determined through automated and end-user testing that those proposed additions, updates, or changes are Accessible.

(11)     Defendant shall conduct (a) an automated scan monthly and (b) end-user testing quarterly thereafter to ascertain whether any new posted content is Accessible. Defendant shall notify all employees and contractors, if any, involved in digital development if corrections to the Online Store are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)    Following the date of the Court's order, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)    Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's order which summarizes the progress Defendant is making in meeting its obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[34]

(F)    Whatever other relief the Court deems just, equitable and appropriate; and

(G)    An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: August 16, 2023                          */s/ Kevin W. Tucker*

Kevin W. Tucker (He/Him) (PA 312144)

---

[34] *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Aug. 15, 2023) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).

Kevin J. Abramowicz (He/Him) (PA 320659)
Chandler Steiger (She/Her) (PA 328891)
Stephanie Moore (She/Her) (PA 329447)
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208

Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com